UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/28/2022
```

-------------------------------------------------------------- X
                       :

PREMIER MEDICAL SYSTEMS, LLC,     :
                       :
                       :

            Plaintiff,   :          1:21-cv-1337-GHW
                       :

       -v-          :    MEMORANDUM ORDER AND

NEUROLOGICA CORP.,       :         OPINION
                       :

           Defendant.  :
                       :
-------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Plaintiff Premier Medical Systems, LLC ("Plaintiff" or "Premier") markets, sells, and distributes Samsung ultrasound systems in the United States as sales representative for Defendant NeuroLogica Corp. ("NeuroLogica" or "Defendant"). Pursuant to a sales representative and dealership agreement (the "SRA") governing the parties' relationship, Plaintiff facilitates the return and replacement of malfunctioning ultrasound probes that are covered by warranty. In 2020, Defendant implemented a new policy that required Plaintiff to make a preliminary determination as to the cause of damage to a probe, and also began billing Plaintiff—instead of the customer—for replacement probes that Defendant determined had been damaged by the customer.

Plaintiff alleges that Defendant's new policy breached the SRA, and also brings other claims related to Defendant's conduct subsequent to the imposition of that policy. Defendant moved to dismiss. While Plaintiff has not successfully pleaded all of its claims, the relevant provisions of the parties' agreement are ambiguous. As a result, the breach of contract claim cannot be dismissed, and Defendant's motion to dismiss is granted in part and denied in part.

## II.     BACKGROUND[1]

### a.  Factual Background

Plaintiff is a sales representative for Defendant NeuroLogica Corporation.  Am. Compl., Dkt. No. 26 ("AC") ¶ 1.    Defendant holds the rights to market, sell, and distribute Samsung ultrasound systems in the United States.  *Id.*  Plaintiff primarily serves as Defendant's agent, "facilitating sales of products directly between Samsung and its customers, for which Premier receives a sales commission as compensation."  *Id.* ¶ 2.

The parties' relationship is governed by a sales representative and dealership agreement, dated January 1, 2016 (the "SRA").  *See* AC Ex. 1.  Pursuant to that agreement, Plaintiff is "the exclusive sales representative and dealer of certain specified Samsung ultrasound products to women's health providers in a thirteen-state territory."  AC ¶ 19.  In addition, Plaintiff provides "certain dealer labor services to end users during the term of Samsung's 24-month original warranty."  *Id.* ¶ 21.  Plaintiff can also sell separate service contracts covering the products after the conclusion of that original warranty period.  *Id.* ¶ 22.

### a.  The 2020 Probe Replacement Policy

"[U]nder long-established practice," when a customer reports that a product has malfunctioned, "Premier and its technicians quickly inspect the product either virtually or in person."  *Id.* ¶ 24.  Because Plaintiff "cannot fix a broken probe," Plaintiff then orders a replacement part, which, Plaintiff asserts, "Samsung must provide at its own expense" (although it retains the right to ultimately invoice the customer for the replacement part).  *Id.*  According to Plaintiff, the parties have maintained this practice "for the past ten years."  *Id.* ¶ 25.

On August 25, 2020, Defendant "unilaterally purported to change the parties' longstanding

---

[1] Unless otherwise noted, the facts in this section are drawn from the amended complaint.  Dkt. No. 26 ("AC").  The Court "accept[s] all facts alleged in the [amended] complaint as true and draw[s] all reasonable inferences in the plaintiff's favor."  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).

practices under the SRA concerning the replacement of malfunctioning ultrasound probes during the warranty period" (the "Probe Replacement Policy"). *Id.* ¶ 28. Specifically, Defendant began requiring that its sales representatives, including Plaintiff, make a preliminary determination as to whether an ultrasound probe had malfunctioned due to customer-caused damage. *Id.* ¶ 29. Making that determination "can be difficult," because, among other reasons, many replacement probes are refurbished and do not start off in perfect condition. *Id.* And, in the ten previous years, Defendant had at no point "trained Premier to perform this new task, nor provided it with the special diagnostic tools Samsung itself uses to make this determination." *Id.*

Under the Probe Replacement Policy, Plaintiff "would be required to quickly order the customer a new probe" so that the customer's medical practice would not be interrupted. *Id.* ¶ 30. Afterward, Defendant "would conduct its own more rigorous test of the probe . . . using probe evaluation tools unavailable to Premier." *Id.* If Defendant determined that the probe had malfunctioned because of customer-caused damage, Defendant would invoice Plaintiff, and not the customer, for the replacement. *Id.*.

According to Plaintiff, it has "never been required to make any determination concerning probes, let alone a determination of customer-caused damage, and the parties have never allocated to Premier the cost of replacement parts, including probes, during the warranty period." *Id.* ¶ 38. But since October 2020, Defendant has billed Plaintiff over $175,000 to replace probes that Defendant determined had malfunctioned because customers damaged them. *Id.* ¶ 39.

　　　　b. Defendant Imposes Other Requirements, Allegedly In Response to Plaintiff's Protest, and Refuses to Pay Invoices from Plaintiff

Plaintiff objected to Probe Replacement Policy. *Id.* ¶ 38. Allegedly in response, Defendant started to require that Plaintiff make an onsite visit to the customer complaining of a malfunction, even though Plaintiff had historically assessed complaints over the phone or virtually. *Id.* ¶ 41. Defendant also began requiring that Premier issue a written "condition report with images" to

provide its opinion on whether any damage was caused by a customer. *Id.* For these on-site evaluation services, Plaintiff issued Defendant an invoice for $285,000. *Id.* ¶ 43. Defendant refused to pay that invoice. *Id.*

Defendant also refused to pay Plaintiff's invoice in the amount of $13,050 for addressing other product issues (the "Product Issues Invoice"), including making installation visits to customers because of software defects and product shipment errors. *Id.* ¶ 44. Plaintiff also invoiced Defendant $2,278.33 for a commission payment because another dealer sold one of Samsung's products to a customer in Premier's exclusive territory (the "HM70 Probe Invoice"). *Id.* ¶ 45. Defendant has not paid that invoice. *Id.*

### c.   Defendant Imposes Other Requirements

Allegedly in response to Plaintiff's "refusal to accede to the unlawful Probe Replacement Policy," Defendant "has made false and defamatory statements about Premier to its customers." *Id.* ¶ 46. In the only such email identified by Plaintiff, Defendant's national ultrasound service manager Thomas Leinart emailed Premier's customer, Jean Murphy, of "Northwell Health," and stated that Plaintiff "has a responsibility to visit your site and evaluate your probes for warranty replacement" and that Plaintiff had been "uncooperative in their duties to respond to [Northwell's] service needs." *Id.* ¶ 47. As a result, Plaintiff claims that it has suffered "substantial reputational injury and loss of business opportunities." ¶ 50.

In addition, Defendant has "changed its position" on extended warranties and price reduction approvals that had historically been provided to Plaintiff's customers. For instance, in January 2021, Main Line Fertility—a "notable fertility account"—requested three ultrasound units at a cost of $75,000. *Id.* ¶ 52. Plaintiff had typically offered Main Line Fertility a three-year warranty instead of a two-year warranty. *Id.* Defendant refused to permit Plaintiff to provide the extra year of service. *Id.* ¶ 53. Defendant has since rejected similar deals with other clients. *Id.* ¶ 54.

Plaintiff also alleges that Defendant "has refused to allow Premier to purchase Samsung out-of-warranty parts on credit," *id.* ¶ 66; that Defendant has purported to require Premier to pay for out-of-warranty parts within only fifteen days in contravention of long-standing practice, *id.* ¶ 69; and that Defendant has imposed a "new 20% restocking fee to returned parts" that is not required by the SRA, *id.* ¶ 70.

### d.  The 2017 Modification

According to Plaintiff, in or about September 2019, Defendant "repudiated a modification to the SRA" (the "2017 Modification") that had been reached by Phil Sullivan, Defendant's former president and chief executive officer, and John Masini, president of Premier.  *Id.*  ¶ 56.  That modification requested that Plaintiff provide

> additional labor and support requested by Samsung, beyond the scope of Premier's duties under the SRA, including (i) the installation of frequent software upgrades for products in the field, to address software obsolescence and defects, as well as hardware defects, (ii) the installation of hardware updates, due to obsolescence and defects; and (iii) multiple installation visits required due to delivery delays or errors by Samsung, and initial delivery of damaged parts by Samsung.

*Id.* ¶ 57.  In exchange, Defendant "agreed to take over Premier's responsibility for providing clinical applications support for demonstration and training of non-premium products."  *Id.* ¶ 58. Plaintiff avers that it "let go" of its clinical applications training and support team in reliance on that modification.  *Id.* ¶ 59.  It also hired an additional administrator and other employees.  *Id.*

According to Plaintiff, for the following three years, Samsung "took over clinical applications support for demonstrations and training of non-premium products at no cost to Premier."  *Id.*  However, Defendant has changed course and now "purports to bill Premier $1,500 a day for providing clinical applications support of demonstrations and training for non-premium products."  *Id.* ¶ 61.

### e.  Plaintiff and Defendant's Respective Relationships with Mary Hellsund and Moriah Hoover

Because of the 2017 Modification, Plaintiff terminated Mary Hellsund and Moriah Hoover, who were members of its clinical applications support team. *Id.* ¶ 63. Plaintiff has since requested that Ms. Hellsund and Ms. Hoover provide their services to Plaintiff as independent contractors. *Id.* ¶ 63. Plaintiff alleges that Defendant has "blocked them from doing so, in the hope of continuing to charge Premier $1,500 a day for its deficient services." *Id.* ¶ 63.

In addition, Defendant has allegedly "threatened not to use Ms. Hellsund and Ms. Hoover . . . for certain of its own projects unless they refuse to work with Premier." *Id.* ¶ 64. Upon information and belief, Plaintiff asserts that Defendant has "demanded" that the women sign agreements that would bar them from doing so. *Id.* ¶ 64.

### b. Procedural Background

Plaintiff filed its complaint on February 16, 2021. Dkt. No. 1. Plaintiff amended that complaint on May 13, 2021. AC. Defendant moved to dismiss on June 25, 2021. Dkt. No. 34 ("Mem."). Plaintiff filed its opposition on July 23, 2021. Dkt. No. 35 ("Opp'n"). Defendant filed its reply on August 6, 2021. Dkt. No. 37 ("Reply").

## II. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all well-pleaded factual allegations and draws all inferences in the plaintiff's favor. *See Palin v. N.Y. Times Co.*, 933 F.3d 160, 165 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010). To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 544).  Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### A.  The Court Declines to Consider the Masini Declaration in Considering the Motion to Dismiss

To its opposition, Plaintiff attaches a declaration of its president, John Masini, which includes information regarding recent changes to the Probe Replacement Policy and attaches a table listing Defendant's charges to Plaintiff.  Dkt. No. 36 (the "Declaration").  The Court declines to consider the Declaration in resolving Defendant's motion to dismiss.  "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d

Cir. 2006)). "For a document to be considered integral to the complaint, the plaintiff must 'rel[y] on the terms and effect of a document in drafting the complaint . . . mere notice or possession is not enough.'" *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002)). "And 'even if a document is "integral" to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document,' and it must be clear that 'there exist no material disputed issues of fact regarding the relevance of the document.'" *Id.* (quoting *DiFolco*, 622 F.3d at 111).

Here, the Declaration is not incorporated by reference; the amended complaint does not reference the Declaration. Nor is the information in the Declaration integral to the complaint. The amended complaint does not rely on the transactions listed in the table. Moreover, the Declaration includes new facts regarding conduct that occurred *after* Plaintiff filed its complaint. *See* Declaration ¶¶ 4–5. It is simply impossible for Plaintiff to have relied on future, then-unknown events to draft its complaint. Accordingly, the Court declines to consider the Declaration in resolving the motion to dismiss. *See Sugar v. Greenburgh Eleven Union Free Sch. Dist.*, No. 18 CV 67 (VB), 2018 WL 6830865, at *5 (S.D.N.Y. Dec. 28, 2018) (on a motion to dismiss, refusing to consider a declaration that was dated "two weeks after the amended complaint was filed").

## III. DISCUSSION

### A. Breach of Contract

#### 1. *Plaintiff Adequately Pleads Defendant Breached Sections 6.3 and 8.24 of the SRA*

Plaintiff has adequately pleaded that Defendant's implementation of the Probe Replacement Policy breached Sections 6.3 and 8.24 of the SRA. Because the SRA states that "any dispute or controvers[ies] arising either directly or indirectly" out of the SRA "will be governed and construed in accordance with the law of the State of New York[,]" the Court applies New York law to the

breach of contract claim.  SRA § 29.4.  "To state a claim for breach of contract under New York law, 'the complaint must allege:  (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'"  *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).  The parties do not dispute that the SRA is binding contract, nor do they dispute that Premier performed under the SRA.

Here, the Court finds that the operative contractual provisions governing the allocation of costs for the replacement of probes are ambiguous.  Therefore, Plaintiff's claim that Defendant breached §§ 6.3 and 8.24 cannot be dismissed.  On a motion to dismiss, "a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous."  *Orchard Hill*, 830 F.3d at 156; *see also Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim.").  Courts are not "obliged to accept the allegations of the complaint as to how to construe a contract," but they "should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss."  *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)).

To assess whether contractual language is ambiguous under New York law, courts examine whether the language "could suggest more than one meaning when viewed objectively by a reasonably intelligent person."  *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted).  Such person would be "cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Id.* (internal citation and quotation marks omitted).  Further, "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations."  *Seiden Assocs., Inc.*

*v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).

Here, Plaintiff argues that the Probe Replacement Policy breached Section 8.24 of the SRA, which provides:

> [Plaintiff] shall provide warranty services (but not parts or software which shall be provided by NeuroLogica) with respect to the Products during the term of the applicable Product warranty in accordance with NeuroLogica service policies and procedures including, but not limited to, the service obligations set forth on Appendix 8.

SRA § 8.24. Appendix 8, in turn, includes a provision titled "Obligations of NeuroLogica," which states that Defendant will

> [p]rovide, at no cost to [Plaintiff], all replacement parts necessary for [Plaintiff] to provide in-warranty repair of the Products during the Product's applicable warranty. For out-of-warranty repair of the Products, [Defendant will] sell parts for the Products to [Plaintiff] for inventory purposes pursuant to the then current prices and other terms and conditions or as otherwise provided in a NeuroLogica Parts Agreement. *[Plaintiff] is responsible for payment for any parts used in out-of-warranty repairs or if a warranty claim is rejected because it is later determined that the Product was not eligible for warranty service.*

SRA app. 8, at 37–38 (emphasis added).

The parties propose alternative constructions of the final sentence in that provision. Defendant argues that the provision requires Plaintiff to pay to pay for parts where Defendant later determines that the part was damaged for reasons that would render the warranty inapplicable, including customer-caused damage. *See* Mem. 10–11. Plaintiff proposes that the provision requires Plaintiff to pay for parts only where Plaintiff replaces that part under the mistaken assumption that the term of the warranty has not expired or lapsed, but it is later determined that the policy had, in fact, expired or lapsed. *See* Opp'n at 15–16. In other words, under Defendant's construction "in warranty" would mean that the product malfunctioned within the warranty period, and also that there are no other applicable exclusions to the warranty. Under Plaintiff's construction, "in warranty" means only that the product's warranty has not expired or otherwise lapsed, without regard to whether an exclusion from the warranty applied.

At this early stage in the proceedings, the Court cannot conclude as a matter of law that Plaintiff's construction is unreasonable. The SRA does not define the terms "eligible," "in warranty," or "out of warranty." Without any definition, it is plausible that the relevant provisions in Appendix 8 (b) required Plaintiff to pay for probes only Plaintiff replaced the probe on the mistaken assumption that the term of warranty had lapsed. And because the Court must resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss, Defendant's motion to dismiss Plaintiff's breach of contract claim is denied. *See Lussoro v. Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 483 (E.D.N.Y. 2020) ("Plaintiff has presented an alternative reasonable interpretation of the Contract language . . . . This is sufficient to state a breach of contract claim."); *Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 640 (S.D.N.Y. 2020) (where two conflicting constructions of an agreement were "plausible," Plaintiff's sufficiently alleged breach of contract).

Defendant argues that "eligibility" for warranty services is unambiguous because it is defined in SRA appendix 6, exhibit A, *see* SRA at 33, but that argument is not persuasive. Appendix 6 is titled "Seller Warranty Statement," and provides:

> [W]arranties . . . set forth [therein] do not apply to Product . . . that SELLER furnishes to End-User as a business courtesy, or if warranty service is necessitated in whole or in part by . . . Product having been abused or damaged by casualty or accident or Product not used in accordance with its manuals.

*Id.* app. 6, ex. A, ¶ 2. First, as that provision appears in the "Seller Warranty Statement," it is reasonable to infer that it describes warranties that Defendant (the "SELLER") made to the "End-User"—not the duties between Defendant and Plaintiff. Indeed, none of the provisions in the SRA that pertain to Plaintiff and Defendant's relationship suggest that Plaintiff would be bound to the warranty requirements set forth in the Seller Warranty Statement.

More fundamentally, the terms in the Seller Warranty Statement differ from the terms at issue in the Parties' dispute. By its own terms, the Seller Warranty Statement explains circumstances in which warranties "do not apply" to a Product. But, as explained above, the parties' obligations

under Sections 6.3 and 8.24 of the SRA depend on whether a product is "eligible for warranty service." The Court can reasonably infer that a product might be "eligible" for warranty service in the first instance, but that the warranty may "not apply" to that product in certain circumstances. [2] Accordingly, Plaintiff has stated a claim for breach of contract.

### 2. Plaintiff's Claim that Defendant Breached the SRA By Requiring Plaintiff to Pay Invoices in 30 Days and Imposing a 20% Restocking Fee is Not Dismissed

Plaintiff sufficiently pleads that Defendant breached the SRA by requiring Plaintiff to pay invoices for out-of-warranty parts in 15 days and by imposing a 20% restocking fee for returned parts. *See* AC ¶ 68–70. Defendant does not dispute that Plaintiff adequately alleges that Defendant breached the SRA by imposing these requirements; instead, Defendant argues only that Plaintiff has not sufficiently alleged any damages from those purported breaches. *See* Mem. at 14. At this stage, Plaintiff "need only plead allegations from which damages attributable to defendant's breach might be reasonably inferred." *Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, No. 14-CV-9687, 2016 WL 4916969, at *6 (S.D.N.Y. Feb. 11, 2016) (citations and alterations omitted); *Bloomberg Fin. L.P. v. UBS AG*, 358 F. Supp. 3d 261, 276 (S.D.N.Y. 2018) (same). Plaintiff does so. Here, the imposition of a 20% restocking fee would result Plaintiff paying fees it otherwise would not have, and it is reasonable to infer that shortening the timespan in which Plaintiff is permitted to pay invoices could result in damages to Plaintiff. Accordingly, Plaintiff has stated a claim for breach based on Defendant's imposition of those requirements.

---

[2] Defendant also argues that the SRA contemplated that Plaintiff would ultimately bill the end-user for the cost of any replacement probes, which would support its interpretation of the SRA as requiring Plaintiff to pay for parts replaced due to customer-caused damage. First, Defendant does identify the mechanism in the SRA by which Plaintiff would bill the end-user, thereby undercutting the factual premise of its argument that Plaintiffs would, in fact, have the ability bill the end-user. And moreover, that Plaintiff would ultimately bill the end-user does not concern the contractual relationship between Plaintiff and Defendant's, as established in Section 8.24 and Appendix 8 of the SRA.

### 3.   *Plaintiff's Claim that Defendant Breached the SRA By Refusing to Pay the HM70 Probe Invoice Is Not Dismissed*

Plaintiff's claim for breach of contract based on Defendant's failure to pay the $2,278.33 HM70 probe invoice is not dismissed.  Defendant does not dispute that its failure to pay the invoice breached the SRA, but argues only that Plaintiff would lack standing to bring this claim were its other claims dismissed, since the amount in controversy would fall below the $75,000 threshold necessary to establish diversity jurisdiction.  *See* Mem. at 24.  Because Plaintiff has sufficiently pleaded its other breach of contract claims, the Court may properly retain jurisdiction over Plaintiff's claims for breach based on Defendant's failure to pay the HM70 Probe Invoice.  That claim is not dismissed.

### B.   The Court Declines to Consider Plaintiff's Arguments that Defendant Breached the Implied Covenant of Good Faith and Fair Dealing

The Court declines to consider Plaintiff's arguments that Defendant breached the implied covenant of good faith and fair dealing.  Plaintiff does not bring a claim for breach of the implied covenant of good faith and fair dealing in the amended complaint, but instead raises that claim for the first time in its opposition.  *See* Opp'n at 17–19.  "[A] breach of the duty of good faith and fair dealing is considered a breach of contract."  *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011).  However, to state a claim for breach of the implied covenant of good faith and fair dealing, plaintiffs must satisfactorily allege specific elements that are not required to state a claim for breach of contract, including by "suppl[ying] 'specific factual allegations' of bad faith."  *See JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 507 F. Supp. 3d 490, 505 (S.D.N.Y. 2020) *amended on reconsideration* (Jan. 6, 2003) (*quoting Prospect St. Ventures I, LLC v. Eclipsys Sols. Corp.*, 23 A.D.3d 213, 804 N.Y.S.2d 301, 302 (1st Dep't 2005)).  Indeed, courts have refused to permit plaintiffs to assert a claim for breach of the implied covenant of good faith and fair dealing in briefing where they have not raised

the claim in their complaint. *See Augienello v. Coast-to-Coast Fin. Corp.*, 64 F. App'x 820, 822 (2d Cir. 2003) ("Nowhere in the complaint is there any mention of a duty of good faith and fair dealing, or allegation that the defendants breached such a duty. Thus, the plaintiffs are not asking for liberal construction of their complaint so much as amendment of the complaint to include a claim that they did not plead."); *Bonnie & Co. Fashions v. Bankers Tr. Co.*, 170 F.R.D. 111, 119 (S.D.N.Y. 1997) ("This Court thoroughly has examined paragraphs fifty-nine through sixty-two of plaintiffs' Complaint and can locate no language which can be construed as 'fairly encompassing' a 'breach of good faith and fair dealing' claim.").

Here, Plaintiff's amended complaint lacks any mention of the implied covenant of good faith and fair dealing, let alone does it expressly allege that Defendant breached that duty. Had Plaintiff wanted to bring a claim for breach of the implied covenant of good faith and fair dealing, it could have requested the Court's leave to amend and added a claim in an amended complaint. Instead, Plaintiff asks the Court to stretch the bounds of its existing allegations to encompass an entirely unpleaded claim. The Court declines to do so. Accordingly, the Court declines to consider Plaintiff's newly asserted claims for breach of the implied covenant of good faith and fair dealing.[3]

## C. Plaintiff's Claim for Quantum Meruit Is Not Dismissed

Plaintiff adequately pleads a claim for quantum meruit. To recover in quantum meruit in New York, a plaintiff must plead "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (citation omitted). Under New York law,

---

[3] In its opposition, Plaintiff alleges that its claims for breach based on Defendant's "refusals (1) to provide extended warranties previously offered to customers to close sales; [and] (2) to allow Premier to make purchases on credit" are pleaded under a theory of breach of the implied covenant of good faith and fair dealing. *See* Opp'n at 17 n.9. Accordingly, the Court declines to consider those arguments.

courts may consider a plea to recover in quantum meruit "together [with an unjust enrichment theory] as a single quasi contract claim." *Id.* Because unjust enrichment and quantum meruit sound in quasi-contract, recovery is available only in the absence of an enforceable agreement that governs the same subject matter. *Beth Israel*, 448 F.3d at 586–87; *MidHudson*, 418 F.3d at 175. The existence of an express agreement governing the same subject matter precludes recovery in quantum meruit. *Id.* at 588; *see also Skyline Restoration, Inc. v. Great Am. Restoration Servs. Inc.,* No. 18-CV-5634 (JS)(SIL), 2019 WL 5150207, at *4 (E.D.N.Y. Aug. 5, 2019) ("New York law does not permit recovery under unjust enrichment or quantum meruit where such claims are duplicative of a breach of contract claim and the court has determined that there is a valid, enforceable contract that governs the same subject matter."). The parties do not dispute that Plaintiff adequately pleads the requisite elements of a quantum meruit claims; they disagree only on whether the SRA governs the same subject matter for which Plaintiff now seeks payment of the reasonable value.

Here, Plaintiff sufficiently alleges that it performed services outside of the scope of the SRA. Plaintiff seeks payment for conducting "preliminary determination[s] of whether a probe was subject to customer damage." *See* AC ¶¶ 84–86. The SRA does not contain any provision that unambiguously requires Plaintiff to perform a preliminary determination of whether a probe was subject to customer damage. Indeed, Defendant points to numerous provisions that require Plaintiff to, for instance, to "follow all applicable NeuroLogica service policies and procedures" and to "dispatch a qualified technician to service and repair" Defendant's products. Mem. at 15 (citing SRA §§ 8.25, Appendix 8(c), 8(d)). But those statements are ambiguous—they do not unequivocally clarify whether Plaintiff had an obligation to determine whether Plaintiff had an obligation to determine whether damage to a probe was caused by a customer. At this early stage in the proceedings, the Court cannot conclude as a matter of law that Plaintiff's preliminary determinations fell within the scope of the SRA. *See Tel. Mgmt. Corp. v. Barclays Servs. Corp.*, No. 11 CIV. 8570 DAB,

2013 WL 1344706, at *6 (S.D.N.Y. Mar. 28, 2013) (declining to dismiss quantum meruit claims because "the pleadings do not make clear whether the Agreement and Work Order cover the dispute between Plaintiff and Defendants" and "it is not yet apparent when, how, or in what capacity the recommendations were implemented, all factors vital to determining whether the recommendations were within the scope of the Agreement and Work Order"). Accordingly, Plaintiff has stated a claim for quantum meruit on the basis of performing preliminary probe determinations.

In addition, to the extent Plaintiff seeks payment for the Product Issues Invoice, Plaintiff has also stated a claim for quantum meruit. Plaintiff claims that it billed Defendant $13,050.00 for "multiple costly installation visits to customers because of software defects and product shipment errors by Samsung." AC ¶ 44. Notably, Defendant's motion does not address the Product Issues Invoice, nor does it argue that the Plaintiffs alleged "installation visits" caused by software defects and product shipment errors fall would be governed by the SRA. *See* Mem. 14–17; Reply at 7. Accordingly, the argument that Plaintiff's quantum meruit claim should fail to the extent it claims entitlement to payment for the Product Issues Invoice has been waived. *See Bd. of Managers v. 72 Berry St., LLC*, 801 F. Supp. 2d 30, 39 (E.D.N.Y. 2011) (holding that arguments not raised in briefing are "generally deemed waived"). Accordingly, to the extent Plaintiff's quantum meruit claim seeks payment for the Product Issues Invoice, that claim is not dismissed.

### D. Plaintiff's Claim for Declaratory Judgment Is Dismissed

Because Plaintiff's claim for declaratory judgment is duplicative of their breach of contract claims, Plaintiff's declaratory judgment claim will be dismissed. The decision on whether to grant declaratory relief is subject to the court's discretion, which turns on the following considerations: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from

uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (citation omitted). Courts reject declaratory judgment claims "when other claims in the suit will resolve the same issues," because, under such circumstances, a declaratory judgment will not serve any useful purpose. *EFG Bank AG v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 99 (S.D.N.Y. 2018). Accordingly, where a claim for declaratory judgment "seeks a declaration of the same rights as will be determined under [a claimant's] action for breach of contract," it is duplicative and may be dismissed. *Lorterdan Props. at Ramapo I, LLC v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, No. 11-CV-3656 (CS), 2012 WL 2873648, at *9 (S.D.N.Y. July 10, 2012) (citation omitted). Conversely, where "a claim for declaratory judgment 'seeks distinct relief from' a breach of contract claim, then notwithstanding some overlap between the two claims, it is not duplicative." *Personal Watercraft Prod. SARL v. Robinson*, No. 16-cv-9771 (AJN), 2017 WL 4329790, at *11 (S.D.N.Y. Sept. 1, 2017) (citation omitted). In other words, where the plaintiff's rights will be adjudicated through another claim in the litigation, the plaintiff's declaratory judgment claims will be dismissed. *See Com. Lubricants, LLC v. Safety-Kleen Sys., Inc.*, No. 14-CV-7483 (MKB), 2017 WL 3432073, at *17 (E.D.N.Y. Aug. 8, 2017) ("Thus, courts in this Circuit routinely dismiss requests for declaratory judgment when the parties' rights will be adjudicated through a breach of contract claim in the same action.") (collecting cases); *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F.Supp.2d 231, 249 (S.D.N.Y. 2006) ("Plaintiffs' declaratory judgment claim seeks resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action. Therefore, the claim is duplicative in that it seeks no relief that is not implicitly sought in the other causes of action.").

Here, Plaintiff's rights will be adjudicated through its breach of contract and quantum meruit claims, rendering duplicative its claim for declaratory judgment. Plaintiff seeks "a declaratory judgment that the new Probe Replacement Policy violates §§ 6.3 & 8.24 of the SRA, and that Samsung cannot invoice Premier for replacement probes, or any other replacement parts, during the

warranty period of any product." AC ¶ 74. It also seeks a declaration that "nothing in the SRA requires Premier to conduct inspections of probes to determine if they were subject to customer caused damage." *Id.* ¶ 75. As to the declaration that the Probe Replacement Policy violates §§ 6.3 and 8.24, that claim is clearly duplicative of Plaintiff's claims for breach of contract. *See* AC ¶ 80 ("In breach of §§ 6.3 & 8.24 of the SRA, Samsung purported to adopt the Probe Replacement Policy and to invoice Premier, rather than the customer, for replacement probes ordered during the original warranty period."). Similarly, Plaintiff's request for a declaration that it was not required to provide probe assessment service similarly duplicates the request for relief in its quantum meruit claims, which seek payment for the value of those services. *See Campione v. Campione*, 942 F. Supp. 2d 279, 285 (E.D.N.Y. 2013) ("If the Plaintiff succeeds on her unjust enrichment claim, this would necessarily entail a finding by this . . . the Defendant is being unjustly enriched . . . ."). Indeed, Plaintiff does not dispute that these claims are duplicative. Accordingly, Plaintiff's claim for a declaratory judgment is dismissed.

### E.  Plaintiff Sufficiently Pleads Defendant Breached the 2017 Modification

Plaintiff sufficiently pleads a breach of the 2017 Modification. "New York law generally recognizes and enforces [contractual clauses that prohibit oral modification]." *7 Ba Chub Cay, LLC v. McCrory*, No. 08 CIV. 5217 (JSR), 2009 WL 976826, at *2 (S.D.N.Y. Apr. 8, 2009) (citing N.Y. Gen. Oblig. Law § 15-301(1)). "[U]nder the doctrine of partial performance," however, "such an oral agreement may be enforced even in the absence of a writing if either party has partially performed under the terms of that oral agreement." *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 121 (2d Cir. 1998) ("*Merrill Lynch*"); *Mindspirit, LLC v. Evalueserve Ltd.*, 470 F. Supp. 3d 366, 380 (S.D.N.Y. 2020) (quoting *Merrill Lynch* for the same). "For partial performance to overcome § 15–301, that partial performance must be 'unequivocally referable' to the new contract." *Merrill Lynch*, 155 F.3d at 122 (citing *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 344, 366 N.E.2d 1279, 1283 (1977)).

To be "unequivocally referable," "the action taken must be unintelligible or at least extraordinary, explainable only with reference to the oral argument." *Id.* at 122 (internal quotation marks and citation omitted). In addition, "[i]f the conduct that allegedly constituted partial performance of the oral agreement to modify was in fact compatible with the original agreement, the oral agreement will not be enforced." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990).

Equitable estoppel can also serve to overcome a provision that prohibits oral modifications to a contract. "Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute to bar proof of that oral modification." *Rose*, 42 N.Y.2d 338, 344 (1977*); Randolph Equities, LLC v. Carbon Cap., Inc.*, 648 F. Supp. 2d 507, 518 (S.D.N.Y. 2009) ("A party can overcome a no-oral-modification clause by showing either partial performance or equitable estoppel."). "Comparable to the requirement that partial performance be unequivocally referable to the oral modification, so, too, conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written." *Rose*, 42 N.Y.2d at 344. Here, the parties do not dispute that the SRA could only be modified in a writing signed by both parties. *See* SRA § 29.5; Mem. at 16; Response at 21–23. Thus, Plaintiff must plead either partial performance or equitable estoppel.

Plaintiff sufficiently pleads partial performance. According to Plaintiff, the 2017 Modification required Plaintiff to provide installation of various hardware and software updates, as well as other services including installation visits required due to Defendant's delivery delays from Samsung. AC ¶ 57. In return, Defendant would "take over Premier's responsibility for providing clinical applications support for demonstrating and training of non-premium products." *Id.* ¶ 58. "[F]or three years thereafter," Plaintiff asserts, Defendant "hired additional staff of its own . . . and took over clinical applications support for demonstrations and training of non-premium products at no cost to Premier." *Id.* ¶ 59. Defendant does not dispute that it did, in fact, perform under the

terms of the 2017 Modification.  That conduct is sufficient to show partial performance.  *See Fisher Sci. Co. L.L.C. v. Ortho-Clinical Diagnostics, Inc.*, No. 1:18-CV-3088 (ALC), 2019 WL 1427564, at *5 (S.D.N.Y. Mar. 29, 2019) (finding partial performance where parties undertook actions inconsistent with the terms of an agreement, including beginning work on various projects that was inconsistent with deadlines in the written agreement); *Eminah Properties LLC v. Energizer Holdings, Inc.*, 531 F. Supp. 3d 593, 603 (E.D.N.Y. 2021) (concluding that partial performance overcame the statute of frauds where plaintiffs alleged that they agreed to buy batteries at high enough price that a written agreement would have been required under the statute of frauds, but plaintiffs paid those higher prices absent any written agreement).

Nevertheless, Defendant asserts that its conduct was compatible with the SRA, such that the doctrine of partial performance would not apply.  But at this stage of the litigation, the Court cannot conclude as a matter of law that Defendant's conduct was compatible with the SRA.  Defendant points to Section 8.18 of the SRA, which states that "[u]pon Dealer's written request, NeuroLogica will provide demonstration and installation support for any non-premium segment Products sold by Dealer using the guidelines established by NeuroLogica."  SRA § 8.18.  According to Defendant, its conduct—charging Plaintiff $1,500 a day for its demonstration and installation support for non-premium segment products—is fully consistent with that provision.  Mem. at 18.  But Defendant ignores allegations that Defendant provided those services "at no cost" to Plaintiff for three years and "took over" clinical applications support, ostensibly, such that Plaintiff no longer provided those services.  AC ¶ 59.[4]  There are no provisions in the SRA under which Defendant would

---

[4] Notably, it is not clear from Plaintiff's complaint whether Defendant's current charges that "exceed $350,000" consist of charges accumulated since 2017, or since the 2017 Modification was allegedly "repudiated" in 2019.  If the former, Defendant's conduct—charging Plaintiff for clinical application support and demonstration for non-premium products—there is a stronger argument that the conduct was compatible with the terms of the SRA, since the SRA would expressly permit Defendant to charge Plaintiff that amount.  But at this early stage of the litigation, when the Court must draw all inferences in Plaintiff's favor, the Court must infer that the charges accumulated after the 2017 Modification's repudiation in 2019.

undertake those services free of cost to Plaintiff.  Nor are there allegations that Plaintiff made a

"written request" for Defendant to take over that work, as would be required under Section 8.18.  In

other words, that Plaintiff undertook that work absent a written request is not an option provided by

the SRA.  *See Rose*, 42 N.Y.2d at 345 (determining partial performance was sufficient to demonstrate

a modification to an agreement where the parties' conduct "was not compatible with any option in

the written agreement"); *S. Liberty Realty Corp. v. Mercury*, 739 N.Y.S.2d 579 (2d Dep't 2002) ("[T]he

deferral of payment of $150,000 of the purchase price at closing of title can only be explained by

reference to the oral agreement to modify, and is not compatible with any provision of the written

agreement.").  Thus, Plaintiff has sufficiently pleaded a claim for breach of the 2017 Modification.

### F.  Plaintiff Does Not Plead a Claim for Tortious Interference with Prospective Economic Advantage

Because Plaintiff has not plausibly alleged that Defendant acted for a wrongful purpose,

Plaintiff fails to state a claim for tortious interference with its prospective economic advantage.

> To prevail on a claim for tortious interference with business relations—also known
> as tortious interference with prospective economic advantage—under New York
> law, a plaintiff must show that (1) the plaintiff had business relations with a third
> party; (2) the defendant interfered with those business relations; (3) the defendant
> acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4)
> the defendant's acts injured the relationship.

*16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (internal quotation and citation

omitted).  "[T]he requirements of this tort are more demanding than those imposed on a party

asserting tortious interference with the performance of an existing contract."  *Henneberry v. Sumitomo*

*Corp. of Am.*, 532 F. Supp. 2d 523, 547 (S.D.N.Y. 2007).  Also, "conduct constituting tortious

interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at

the party with which the plaintiff has or seeks to have a relationship."  *Carvel Corp. v. Noonan*, 3

N.Y.3d 182, 192 (2004).

In *16 Casa Duse*, the Second Circuit explained the requirements for the third element of a tortious interference claim:

> [T]he "wrongful means" element sets a high bar.  Unlike a claim for tortious interference with contract, which requires a plaintiff to show no more than that the defendant intentionally and without justification procured a breach of a valid contract of which he was aware, a claim for tortious interference with business relations requires a plaintiff to show, "as a general rule," that "the defendant's conduct amounted to a crime or an independent tort."  New York courts have recognized an exception to this rule "where a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs."  But this exception is narrow:  When a defendant has acted with a permissible purpose, such as "normal economic self-interest," wrongful means have not been shown, even if the defendant was "indifferent to the plaintiff's fate."  The New York Court of Appeals has not yet identified any other exceptions to the general rule.

791 F.3d at 262 (first citing *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996); and then quoting *Carvel Corp.*, 3 N.Y.3d at 190–91) (internal citations and alterations omitted).  In sum, the third element of a tortious interference with economic advantage claim is satisfied when either (1) the defendant used improper means because her conduct "amounted to a crime or independent tort" or (2) the defendant acted with a wrongful purpose because she acted "for the sole purpose of inflicting intentional harm on plaintiffs."  *Id.* (citations omitted).

Plaintiff does not sufficiently allege the third element of a claim for tortious interference with prospective business relations.  First, Plaintiff does not identify in its complaint or its opposition how Defendant's conduct concerning Ms. Hellsund and Ms. Hoover amounts to a crime or independent tort; it asserts only that Defendant "intentionally and unlawfully sought to block Ms. Hellsund and Ms. Hoover from resuming providing their services to Premier."  Opp'n at 24.  Thus, not only are any allegations of unlawfulness absent from the complaint, but the assertion of "unlawfulness" in its opposition is highly conclusory.

Because the complaint does not plausibly plead that Defendant's conduct was criminal or independently tortious, it must plead that the exception applies—namely, that Defendant engaged in its conduct "for the sole purpose of inflicting intentional harm" on Plaintiff.  *Carvel Corp.*, 3 N.Y.3d

at 190.  But the amended complaint expressly alleges that Defendant blocked Ms. Hellsund and Ms. Hoover from working for Plaintiff "in the hope of continuing to charge Premier $1,500 a day for its deficient service."  AC ¶ 63.  In other words, by Plaintiff's own allegations, Defendant acted in its own economic self-interest—and not for the sole purpose of harming Plaintiff—by preventing Ms. Hellsund and Ms. Hoover from working for Plaintiff.  *See Carvel*, 3 N.Y.3d at 190 (dismissing tortious interference with prospective business relationships claims where "it is undisputed that Carvel's motive in interfering with the franchisees' relationships with their customers was normal economic self-interest; Carvel wanted to reverse a period of business declines and make itself more profitable. It was not acting solely to hurt the franchisees"); *SING for Serv., LLC v. DOWC Admin. Servs.*, LLC, No. 1:20-CV-5617-GHW, 2022 WL 36478, at *23 (S.D.N.Y. Jan. 3, 2022) (denying tortious interference with prospective relationships where the plaintiff's allegations demonstrated that the defendant acted "to promote its economic self-interest").  Accordingly, Plaintiff's tortious interference with prospective business relations claim is dismissed.

### G.  Plaintiff Does Not Sufficiently Allege Defamation

Plaintiff has not adequately pleaded a claim for defamation.  "In New York, '[d]efamation is the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.'"  *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 41 (1st Dep't 2014)) (some internal quotation marks omitted).  "To state a claim for defamation, a complaint must allege '(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm.'"  *Id.* (citing *Stepanov*, 987 N.Y.S.2d at 104).

As to the fourth category, "New York recognizes a limited category of statements to be

libelous per se which do not require pleading and proof of special damages." *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985). "If a statement is defamatory per se, injury is assumed" and no special damages need be alleged. *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 179 (2d Cir. 2000). "The line between statements that are defamatory per se and those that require proof of special damages remains fuzzy." *Id.* However, "[o]ne useful general rule is that 'a writing which tends to disparage a person in the way of his office, profession or trade' is defamatory per se and does not require proof of special damages." *Id.* "A related rule is that '[w]here a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed.'" *Id.* (quoting *Ruder & Finn Inc. v. Seaboard Surety Co.*, 52 N.Y.2d 663, 439 N.Y.S.2d 858, 422 N.E.2d 518, 522 (1981)) (alteration in original).

At the motion to dismiss stage, "a threshold issue for resolution by the court is whether the statement alleged to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it." *Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997). That determination is "guided not only by the meaning of the words as they would be commonly understood . . . but by the words considered in the context of their publication." *Id.* (citing *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 381, 625 N.Y.S.2d 477, 649 N.E.2d 825 (1995)). Allegedly defamatory statements must not "be read in isolation, but must be perused as the average reader would against the 'whole apparent scope and intent' of the writing." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (quoting *November v. Time Inc.*, 13 N.Y.2d 175, 178, 244 N.Y.S.2d 309, 194 N.E.2d 126 (1963)). A court may not "strain" to interpret statements in their most mild or defamatory sense. *See Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 518 (S.D.N.Y. 2013). Where the challenged statements are "susceptible of multiple meanings, some of which are not defamatory," the court may not conclude, as a matter of law, that the statements are or are not defamatory. *Celle*, 209 F.3d at 178 (citing *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir. 1985)).

To find that a statement qualifies as one that tends to injure another in his or her "trade, business, or profession"—in other words, *per se* defamation—the statement "must be made with reference to a matter of significance and importance for [the operation of the business], rather than a mere general reflection upon the plaintiff's character or qualities." *Liberman v. Gelstein*, 80 N.Y.2d 429, 436 (1992) (citation omitted).  The allegedly defamatory statement must be targeted at the specific standards of performance relevant to the plaintiff's business and must impute conduct that is "of a kind incompatible with the proper conduct of the business, trade, profession or office itself." *Id.* (citation omitted); *see also Van–Go Transp. Co. Inc. v. New York City Bd. of Educ.*, 971 F.Supp. 90, 98 (E.D.N.Y. 1997) ("Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties.").

Plaintiff points to two statements in a December 1, 2020 email to Premier's customer that it claims constitute defamation per se*:* (1) that Plaintiff had "a responsibility to visit your site and evaluate your probes for warranty replacement;" and (2) that Plaintiff had been "uncooperative in their duties to respond to [the customer's] service needs."[5]  AC ¶ 47.  Plaintiff asserts that both of these statements constitute *per se* defamation, and it does not dispute that it fails to plead special damages.

As to the first statement, Plaintiff has not sufficiently pleaded that this statement is *per se* defamatory, because that statement does not impugn the basic integrity or creditworthiness of Plaintiff's business.  It merely states that Plaintiff has a responsibility to travel to Defendant's customers' sites.[6]  The mere existence of a responsibility, divorced from any statement tying that

---

[5] Plaintiff also make the general allegation that "on a number of occasions, Samsung has made false and defamatory statement about Premier to its customers." AC ¶ 46.  But Plaintiff cannot sustain a claim for defamation with that conclusory allegation.

[6] Notably, Plaintiff does not allege that Defendant told Northwell that Plaintiff *failed* to satisfy any responsibilities—only that such responsibilities existed.

responsibility to Plaintiff's credibility or integrity (e.g., stating that is failed to satisfy that responsibility), is insufficient as a matter of law to plead a claim for *per se* defamation.

The second statement in Defendant's email to Northwell—that Plaintiff had been "uncooperative in their duties to respond to [Northwell's] service needs"—does not constitute defamation *per se* because it is an opinion. Statements of opinion are not actionable as defamation, "however unreasonable the opinion or vituperous the expression of it may be." *Davis*, 754 F.2d at 85 (quoting *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977)). Whether a challenged statement is an opinion is a question of law. *See id.* A statement of "pure opinion" is "'either accompanied by a recitation of the facts upon which it is based' or 'does not imply that it is based upon undisclosed facts.'" *Biro*, 883 F. Supp. 2d at 461 (quoting *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986) (citations and quotations omitted)).

There are three factors that the New York Court of Appeals has identified as providing guidance as to whether a statement is fact or opinion:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 153 (1993) (alteration omitted) (citations and quotation marks omitted).

Statements of opinion that "impl[y] a basis in facts which are not disclosed to the reader or listener" may be actionable "because a reasonable listener or reader would infer that the speaker or writer knows certain facts, unknown to the audience, which support the opinion and are detrimental to the person toward whom the communication is directed." *Id.* at 153–54 (alterations omitted) (citations and quotations omitted). Such statements are referred to as "mixed opinion." *Chau v. Lewis*, 935 F. Supp. 2d 644, 658–59 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014) (quoting

*Steinhilber*, 68 N.Y.2d at 289–90).

Here, the statement that Plaintiff had been "uncooperative in their duties to respond to [Northwell's] service needs" is an opinion. First and foremost, the term "uncooperative" cannot be proven true or false—indeed, whether an entity's conduct is "uncooperative" is a subjective determination. *Cf. Ganske v. Mensch*, No. 19-CV-6943 (RA), 2020 WL 4890423 (S.D.N.Y. Aug. 20, 2020) ("Although the term 'xenophobic' does have a fairly clear meaning in the context of the Tweet, it is not capable of being proven true or false"); *600 West 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 142 (1992) (concluding that "[t]he allegation of 'denigration' " is not actionable because, "[w]hether defined as 'cast[ing] aspersions on' or 'belittl[ing][,]' . . . the term falls far short of any requirement of verifiability"). Second, the term "uncooperative" lacks a precise meaning. While it generally suggests a that an entity or individual is not particularly accommodating , it does not provide a degree of certainty as to how and to what degree that lack of accommodation manifested. *Cf. Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 381 (S.D.N.Y. 1998) ("[N]or is it possible to determine, with any degree of certainty, what it means to be 'desperate to stand out as a hero.'").

And finally, Plaintiff's allegations are largely silent as to the nature of the email sent to Northwell Health on December 1, 2020. Plaintiff alleges that the email was sent to its customer, but does not describe any other details regarding the email (other than its inclusion of the previously described statement).[7] Those allegations are insufficient to suggest that Northwell would view the statement as a fact rather than an opinion. Thus, Plaintiff has not pleaded a claim for defamation based on the statement in the December 1, 2020, email to Northwell that Plaintiff had been "uncooperative." *See Goldberg v. Coldwell Banker, Inc.*, 553 N.Y.S.2d 432, 433 (2d. Dep't 1990)

---

[7] Notably, Plaintiff does not allege any connection between the two statements in the December 1, 2020 letter. It does not allege, for instance, that the letter stated that Plaintiff had a responsibility to visit Northwell and evaluate your probes for warranty replacement, *had failed to do so*, and thus was uncooperative in its duty to respond to Northwell's service needs. While the Court must draw all inferences in Plaintiff's favor, it cannot create new factual allegations where Plaintiff has not alleged them.

(determining that statement that an attorney "h[ad] been most uncooperative" did not provide grounds for *per se* defamation).  Accordingly, Plaintiff's claim for defamation is dismissed.

### H.  Plaintiff Has Abandoned Its Claims that it is Entitled to Attorneys' Fees

Plaintiff has abandoned its claim that it is entitled to attorneys' fees under Section 26.1 of SRA.  In its opposition, Plaintiff does not respond to Defendant's argument that Plaintiff is not entitled to attorneys' fees under that provision.  *See* Mem. at 25.  Accordingly, any arguments that Plaintiff is, in fact, entitled to attorneys' fees have been waived.  *See Kao v. Brit. Airways, PLC*, No. 17 Civ. 0232, 2018 WL 501609, at *5 (S.D.N.Y. Jan. 19, 2018) ("Plaintiffs' failure to oppose Defendants' specific argument in a motion to dismiss is deemed waiver of that issue."); *Yeremis v. Charter Commc'ns Inc.*, No. 1:20-CV-4723-GHW, 2021 WL 5910396, at *7 (S.D.N.Y. Dec. 13, 2021) (same).

## III. LEAVE TO AMEND

Although Plaintiff has already amended his complaint once, Dkt. No. 26, the Court grants Plaintiff leave to replead the dismissed claims.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  While leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party[,]" those circumstances do not apply in this case with respect to the majority of the dismissed claims.  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  Any amended complaint must be filed no later than March 30, 2022.

## IV. CONCLUSION

As stated above, Defendant's motion to dismiss is denied with respect to Plaintiff's breach

of contract and quantum meruit claims.  It is granted with respect to Plaintiff's claims for breach of the implied covenant of good faith and fair dealing, declaratory judgment, tortious interference with prospective business relations, and defamation.  However, the Court has granted Plaintiff leave to replead those claims.

The Clerk of Court is directed to terminate the motion pending at Dkt No. 33.

SO ORDERED.

Dated: February 28, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge